HUMPHREY ALMY *vs.* MARIUS S. DANIELS.

Title to land between Custom House Street and Aborn's Gangway in the city of Providence.

On a bill in equity praying for an injunction to prevent the obstruction of a strip of land forty feet wide extending from Custom House Street, formerly Long Wharf Street, to Aborn's Gangway, which strip was claimed as a private way under a parol contract made in 1851 between the adjoining owners:

Part performance by the complainant and notice to the defendant being alleged:

*Held,* on the evidence adduced, —

No contract proved for the private way claimed in the bill.

No contract proved for the private way on the strip forty feet wide, but this strip is held by the complainant and defendant as tenants in common.

BILL IN EQUITY with a prayer for an injunction.

*August* 11, 1875. STINESS, J. Bill in equity, praying for an injunction to restrain the defendant from obstructing a strip of land in the city of Providence, extending from Custom House Street, formerly called Long Wharf Street, to Aborn's Gangway, forty feet in width.

This strip, lying between the defendant's land on one side and the estates of the complainant and others on the other side, is claimed by the complainant to be a private gangway, by virtue of a parol contract entered into in 1851, between all the owners of the land adjoining said strip, — part performance of which, by the complainant and others, and notice to the defendant, is also claimed.

Between Custom House Street and Aborn's Gangway — which was but twelve feet wide — the land, in 1851, was owned in three long, narrow parcels: that bounding on Custom House Street, which was platted into lots, by the trustees of the Long Wharf estate; the next by Lewis P. Mead; and the third by the heirs of Lowry Aborn. Lots 11 and 12 on the Long Wharf estate were sold to the complainant; lots 8 and 10 to William M. Bailey, trustee; and lot 9 to Charles F. Tillinghast, by deeds, all of which were dated March 29, 1851.

April 23, 1851, Tillinghast conveyed lot 9 to Bailey.

At that time Pine Street extended only to the land of Thomas Harkness, on the side of Aborn's Gangway opposite to the Aborn estate, and a triangular piece of land interposed between the termination of that street and the gangway.

ALMY v. DANIELS.

After the above purchases, the complainant claims that a parol contract was made between himself, Bailey, Mead, and William H. Aborn, as agent of the Aborn estate, to open the gangway claimed in the bill; that said Aborn and Mead were to throw open so much of their lands as was requisite for the purpose, and so much of lots 8, 9, and 10 as was needed was to be purchased of Bailey; that, by the terms of the agreement, a strip of four feet from the easterly portion of lot 10 was to be added to the complainant's estate; and the balance of lot 10, the whole of lot 9, and a small triangular piece of lot 8, were to be the northerly portion of the gangway.

On the 22d of April, 1851, the board of aldermen appointed commissioners to extend Pine Street to Custom House Street, of a width of forty feet; but the petition, if any, prior to this action cannot be found.

The commissioners made a report, dated May 3, 1851, extending Pine Street, through the land of Thomas Harkness; thence across Aborn's Gangway to Custom House Street; the easterly and westerly lines of said extension being coincident with the lines of the gangway as claimed in the bill; the report stating that the lay-out was made April 26, 1851, after notice to all parties, who, with the exception of Harkness, claimed no damage.

On the 29th of April, 1851, Almy paid to Mead the sum of $1,125, — $400, according to the receipt given at the time, being for the strip of four feet, and $725 being "for street purposes."

On the 3d of May, 1851, Bailey deeded to Almy the strip of four feet, lying "easterly of the easterly line of Pine Street as laid out by the board of aldermen;" on the 28th day of April, 1851, he conveyed to Mead lot 9, and May 5, 1851, "that part of lot 10 lying westerly of the easterly line of Pine Street," and the small piece of lot 8, lying "easterly of the westerly line of Pine Street."

On the same day Mead, by deed reciting that said lay-out embraced said land, standing in his name, but actually owned as follows, viz.: by said Mead, $\frac{7}{27}$; by Aborn, $\frac{7}{27}$; by Bailey, $\frac{6}{27}$; and by Almy, $\frac{7}{27}$, conveyed said several interests to Aborn, Bailey, and Almy respectively, "subject to the appropriation thereof by the board of aldermen as aforesaid."

June 2, 1851, by vote of the board of aldermen, that portion

of Pine Street so extended was established as a public highway.

The street was opened to the width of forty feet, between Custom House Street and Aborn's Gangway, but an appeal having been taken by Harkness, all the proceedings were subsequently discontinued.

After this time a shed was placed upon the westerly twenty feet adjoining the Aborn estate, still leaving an entrance twenty feet wide to Aborn's Gangway; but upon the defendant's commencing to erect a permanent building over the entire westerly half of this forty foot strip, — he having purchased this and land adjoining, formerly belonging to Bailey, Mead, and Aborn, — the complainant brings this bill.

The complainant also shows that in 1855 he agreed to purchase of Bailey, trustee, lot 8 and land adjoining; but before the deed was given, feeling that he could not safely do so in view of his business interests, he applied to Mead to take the land in his stead. This Mead agreed to do, if the complainant would take the deed in his own name, Mead paying the purchase money, and convey to him, Mead, upon request. This was accordingly done, and in the deed Bailey conveyed to Almy all his right in and to said street, referring to Mead's deed of May 5, 1851, above mentioned.

The complainant held the land until 1860, when he conveyed to Mead the same land, adding these words: "together with all my right in and to said street," — which were the same words used in the deed from Bailey to him, — and also adding, "being the same premises conveyed to me by deed from William M. Bailey, trustee," &c.

The defendant claims that by this deed the complainant conveyed all his interest in the gangway or street to Mead, which, by sundry mesne conveyances, has come to him.

In view of this, the complainant asks that the deed be construed to apply only to such interest in the street as was conveyed to him by Bailey; or, if the court do not give such construction, to reform the deed, as it was a mistake which arose from the fact that the scrivener copied the language of Bailey's deed, not knowing that Almy had any other interest in the street than that mentioned in said deed.

The defendant in his answer denies the contract, the part performance, and notice of both the contract and mistake in the deed, and claims the benefit of chapters 162 and 193 of the General Statutes, commonly known as the Registration Act and Statute of Frauds, as though pleaded.

In the argument the defendant admits that a contract was made for a *public* street, namely, the extension of Pine Street, but not for a private gangway from Custom House Street to Aborn's Gangway, as claimed in the bill.

Upon these facts and claims, the first question which arises is, What was the contract made in 1851 ? Did it relate to a private gangway, as claimed in the bill, or to the extension of Pine Street, as laid out by the board of aldermen, though subsequently discontinued ?

The complainant's testimony upon this point is as follows : —

Bailey testifies that an agreement was made, money paid, &c., for a street 40 by 36, between his estate and Almy's. In cross-examination, that he supposed the question confined him to 40 by 36. In direct, resumed, that he *understood* there was an arrangement that this street, 40 by 36, should be prolonged to Aborn's Gangway.

He does not say it was not to be extended to Pine Street; neither does he say whether it was to be a public or private way. The fact that he and Almy, after the failure of the public street, congratulated themselves that they, at any rate, had a street between their estates, which would include the land covered by the deed of Mead, May 5, 1851, does not show that they then supposed that the street was to extend beyond their estates.

His testimony, therefore, throws little or no light upon the question raised in this case as to the contract.

The complainant testifies fully that the contract was for a private way from Custom House Street to Aborn's Gangway, forty feet in width.

The only other party to the contract now living is Mead, who denies that any such contract was made, but asserts that the contract was for a forty foot street to Pine Street; that the land thrown out was " with the expectation of a street," meaning a public street; and that the deed of May 5, 1851, was " for the express purpose of a forty foot street to Pine Street."

This comprises all the oral testimony, substantially, as to the contract.

The receipt referred to does not show conclusively to which of the alleged contracts it applies.

The words "for street purposes" would ordinarily imply a public way; but if there had been a contract for a private way, and the city had immediately taken steps to make it a public street, connecting with an established thoroughfare, the parties might properly have used language applying to the circumstances then existing, without thereby disproving the original contract.

The deeds referred to also describe the land conveyed as the extension of Pine Street. But if the original contract was for a private way, the parties might for convenience describe the land as that laid out for Pine Street, supposing that the extension was then secured, and it would not necessarily conflict with the original agreement.

The written evidence, therefore, affords no clear and positive proof of the contract, and leaves us as much in doubt as the oral testimony.

We cannot say from the evidence whether the contract made in 1851 related to the private way from Custom House Street to Aborn's Gangway, or to the proposed extension of Pine Street.

If we look to the probabilities, the defendant's claim would seem to be the correct one.

1. Because it would hardly seem probable that the parties would desire a forty foot street leading simply into a twelve foot gangway, with the possibility of a building facing across its entire width.

2. The purchases by Bailey and Almy were made March 29, 1851, and immediately following we find action taken in regard to the extension of Pine Street.

3. The fact of the purchase by the complainant of the strip of four feet at the rear end of his lots, so as to bring his land out to the proposed line of Pine Street, seems to show that the parties had the extension of Pine Street in mind rather than the private way; for if it had simply been contemplated to have a forty foot gangway from Custom House Street to Aborn's Gangway, this could as well have been laid out along the line of the

complainant's lots, without the purchase of the four feet, as otherwise.

4. The fact that soon after the failure to extend Pine Street, the westerly twenty feet adjoining the Aborn estate was covered by a shed, — the remaining twenty feet of this and the Mead estate having been deeded to the city for a street, — which shed remained until the erection of the defendant's building.

Had it been agreed that there should be a private way forty feet wide, it does not seem probable that this obstruction would have been permitted to remain so many years without objection.

Still it may be asked, if the contract was for a public street, why should Mead have given the deed of May 5, 1851?

The obvious purpose was to vest the fee in those who had contributed for the purchase of the land taken for the street, so that, in case of its subsequent abandonment, it might revert to those who had paid for it.

This deed made the parties tenants in common of the land thereby conveyed; and "although it is not necessary to go further in this case, yet in view of its importance to the parties, and lest the defendant might draw an erroneous inference from the simple decision of the court denying the injunction, and, relying thereon, proceed unadvisedly to complete his building in that part heretofore covered by the preliminary injunction, we consider it proper to express our opinion upon another point raised and fully argued in the case, viz.: the construction of complainant's deed of 1860."

The cardinal rule for the construction of all written instruments is that courts shall carry out the intention of the parties as ascertained from the writing and their relative positions and general purpose.

The rule insisted upon by the defendant is the familiar one that, in cases of uncertainty or repugnancy, that construction shall be given which is most favorable to the grantee.

This rule proceeds upon the principle, that a party who is a *bonâ fide* purchaser for a valuable consideration should not be made to suffer by the grantor taking advantage of a difficulty which he himself has created.

Upon the testimony before us, we do not think that this principle is applicable to this case.

When the deed was made to Almy in 1855, it was really Mead's purchase. Almy simply held the property in trust for Mead, for his accommodation, and upon the understanding and agreement that he was to convey that same property and estate to Mead upon request. It does not appear that Mead ever claimed, or that he ever expected, that Almy was to convey to him any more than he received from Bailey. He could not, therefore, have been deceived in the transaction. By the reference to the deed from Bailey, both parties must have understood that only $\frac{6}{27}$ of the land in dispute was conveyed. It was the intention of the parties, as we view the testimony, to convey and receive that and no more, and we therefore construe the deed to carry that and no more.

By this construction no hardship is done to Mead, for he received all that he purchased. Had he taken the deed directly from Bailey, without the intervention of Almy as his trustee, he would have received only the $\frac{6}{27}$ owned by Bailey.

To hold, therefore, that the deed must be construed strictly against the grantor, and so carry more than that interest, when the intention of the parties is so apparent, and when he acted merely for the accommodation of the grantee, and the grantee had full knowledge of all the facts, would be grossly unjust.

We are of the opinion that Almy still retains $\frac{7}{27}$ undivided, of the land covered by the deed.

It is only necessary to add that we consider that, upon this point, notice to the defendant is sufficiently shown.

We therefore decide : —

1st. No contract is proved for the private way claimed in the bill.

2d. No contract is proved for a private way on the strip forty by thirty-six ; but this strip is held by the complainant and defendant as tenants in common.    *Bill dismissed, without costs.*

*Wingate Hayes*, for complainant.

*George H. Browne & B. N. Lapham*, for respondent.

Note. — The above case was heard by Potter and Stiness, JJ.